UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                         CRIMINAL ACTION

VERSUS

JEROMY MAURICE GREEN                              NO.: 3:14-cr-00014-BAJ-RLB

RULING AND ORDER

Before the Court is Defendant Jeromy Green's ("Mr. Green") **MOTION TO SUPPRESS (Doc. 21),** seeking suppression of "all evidence obtained as a result" of his encounter with East Baton Rouge Sheriff's Deputies on July 5, 2013, (Doc. 34 at p. 4). Said evidence includes: (1) "a semi-automatic handgun"; (2) "a box of ammunition"; and (3) "statements [made] to the [Deputies] during and immediately after [a] warrantless search." (*See* Doc. 34 at p. 1). The Government opposes Mr. Green's Motion, (Doc. 24), and the Court held an evidentiary hearing on June 4, 2014, (Doc. 33). Mr. Green and the Government were each allowed to submit post-hearing briefs on the issues raised in Mr. Green's Motion, based on the evidence received at the hearing. (*See* Docs. 34, 35). For reasons explained below, Mr. Green's Motion will be denied.

I.  BACKGROUND

Mr. Green is charged with possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). The single-charge indictment stems from Mr. Green's July 5, 2013 encounter with East Baton Rouge Sheriff's Office (EBRSO) Deputies at his grandmother's home. In short, the

Jury

Deputies found the handgun and ammunition in the bedroom dresser adjacent to the bed where Mr. Green was sleeping. After taking Mr. Green into custody, Mr. Green made an inculpatory statement indicating that the gun and ammunition belonged to him.

The question raised by Mr. Green's Motion is whether the gun, ammunition, and statement must be suppressed because their recovery resulted from an illegal search. (*See* Docs. 21, 34).[1] Mr. Green argues that each piece of evidence must be suppressed because "the search of the house [that yielded the evidence] was without voluntary consent and[, therefore,] all evidence obtained as a result thereof is inadmissible as a product of an illegal search." (*See* 34 at p. 5). The Government disagrees, contending that "[Mr. Green's grandmother] voluntarily consented to the Deputies [sic] entry into her home to search for the defendant and remove him and the gun." (Doc. 35 at p. 5).

## II. FINDINGS OF FACT

Neither Mr. Green nor the Government submitted evidence with their original filings to support their respective versions of the circumstances surrounding Mr. Green's arrest. Thus, on June 4, 2014 the Court held a hearing on the matter. At that hearing, the Government presented the testimony of Deputy

---

[1] As originally filed, Mr. Green's Motion also asserted that his statement must be suppressed because it was taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See* Doc. 21-1 at pp. 1–2). However, in light of the uncontroverted testimony that Deputies informed Mr. Green of his *Miranda* rights prior to taking his statement, Mr. Green has since abandoned his *Miranda* challenge. (*See* Doc. 34 at p. 4 (Mr. Green's *post*-hearing Memorandum in Support of Specific Motion to Suppress, limited to the issue of whether the evidence recovered is "inadmissible as [the] product of an illegal search")).

2

Melvin Edwards and Corporal Richard Bowser, two of the three Sheriff's Deputies that responded to Mr. Green's grandmother's house on the date of Mr. Green's arrest. Mr. Green presented the testimony of Ms. Edna Mae Thomas, his grandmother. With its post-hearing memorandum, the Government submitted a transcript of grand jury testimony from Ms. Angela Green, Mr. Green's mother. (Doc. 38).

In broad strokes, the witnesses' testimony was complimentary. The Government and Mr. Green agree that on the morning of July 5, 2013, Deputy Edwards, Corporal Bowser, and a third officer, Deputy Cannella, each arrived at Ms. Thomas's residence at 6555 East Monarch Avenue in Baton Rouge, Louisiana. The Deputies were responding to a call from Mr. Green's mother, Angela Green, reporting that Mr. Green was a felon in possession of a firearm, and that he was sleeping in Ms. Thomas's guest room. As it happens, this was *not* the first time that Sheriff's Deputies had responded to Ms. Thomas's house following complaints about Mr. Green. Corporal Bowser testified that he had spoken to Ms. Thomas at her home on at least two prior occasions, one of which involved a complaint by Ms. Thomas that Mr. Green was standing at her front door, ringing her doorbell, and refusing to leave. These prior contacts resulted in incident reports, but no arrests were made.

When the Deputies arrived at Ms. Thomas's house on July 5, they found Ms. Green and Ms. Thomas waiting for them outside. The Deputies approached Ms.

3

Green and Ms. Thomas, inquired about Mr. Green, and quickly learned that he was still asleep in Ms. Thomas's guest room. The Deputies then entered Ms. Thomas's house and proceeded to the guest bedroom where they found Mr. Green. Deputy Edwards—the lead officer—woke Mr. Green, informed him why the Deputies were there, and requested that Mr. Green get dressed and accompany him outside. Mr. Green complied. Before walking him outside, Deputy Edwards asked Mr. Green for permission to search the guest room, which Mr. Green granted.

As Deputy Edwards was speaking with Mr. Green, Corporal Bowser—the back-up officer—visually scanned the guest room and observed what appeared to be a handgun sticking out of an open drawer in the nightstand adjacent to the bed where Mr. Green was sleeping. Corporal Bowser discretely identified the gun to Deputy Cannella, who acknowledged that he had also seen it. After Deputy Edwards removed Mr. Green from the guest room, Corporal Bowser approached the nightstand, confirmed that what he had seen was a gun, and also observed a box of ammunition in plain sight. Corporal Bowser and Deputy Cannella recovered the gun and the ammunition, and then searched the rest of the guest room, but did not find any additional weapons or other contraband material.

Upon completing their search of the guest room, Corporal Bowser brought the handgun and the ammunition to Deputy Edwards, who was still outside with Mr. Green. At this time, Deputy Edwards handcuffed Mr. Green and put him in the back of his patrol car. Deputy Edwards then ran Mr. Green's name through the

EBRSO database, and confirmed that Mr. Green is a convicted felon with outstanding warrants for his arrest. Deputy Edwards then placed Mr. Green under arrest and informed him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Thereafter, Mr. Green provided a statement, indicating that the gun was his.

This much is uncontroverted. The issue raised by Mr. Green's Motion is whether Ms. Thomas provided valid consent for the Deputies to enter her home in their effort to contact Mr. Green. (Doc. 34 at pp. 2–5). On this point, the testimony at the hearing diverged, *albeit slightly*. Deputy Edwards and Corporal Bowser each testified that the Deputies asked for, and received Ms. Thomas's consent to search her residence. Specifically, Deputy Edwards stated that he asked Ms. Thomas if the Deputies could enter the house and "talk to Jeromy," to which Ms. Thomas responded, "Yes," and pointed in the direction of the guest room. Corporal Bowser's testimony confirms this account, as does Ms. Green's testimony to the grand jury. (*See* Doc. 35 at p. 19 (Transcript of Ms. Green's Grand Jury Testimony) (agreeing that "[Ms. Thomas] invited [the Deputies] into the house, and . . . told them . . . where Jeromy was"); *see also id.* at p. 20 (agreeing that the Deputies asked permission to come into Ms. Thomas's house, and that Ms. Thomas gave permission to enter)).

On the other hand, Ms. Thomas testified at the hearing that the Deputies did *not* inquire regarding whether they could search her house, and that she did *not*

grant permission to search her house. However, Ms. Thomas admitted: (1) she complained to her daughter, Ms. Green, that Mr. Green had brought a gun into her house; (2) she was aware that Ms. Green contacted the Sheriff's Office based on her concerns; (3) she met the Deputies upon their arrival; and (4) that when asked about Mr. Green's whereabouts, she told the Deputies that he was "back there sleeping," and gestured to the bedroom. Ms. Thomas also testified that she "stepped back" from the threshold of the door so that the Deputies could enter.

### III. DISCUSSION

As stated, the only issue presented by Mr. Green's Motion is whether Ms. Thomas provided the Deputies valid consent to search her home. Mr. Green's argument can be summed up as follows:

> [L]aw enforcement agents conducting the search and seizure did not obtain consent to enter the Monarch Drive premises from the homeowner Mrs. Edna Thomas, making their warrantless search of that residence unconstitutional. Therefore, the resulting seizures of evidence and the statements made in their presence at the residence are derivative evidence of the unconstitutional search and should be summarily suppressed.

(Doc. 34 at p. 1).

The constitutional framework for assessing the merits of Mr. Green's Motion to Suppress is well-established. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment's protections are effectuated by the "exclusionary rule," which simply

6

states that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *See United States v. Calandra*, 414 U.S. 338, 347 (1974). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.*

Of course, the Fourth Amendment's protection against searches and seizures is *not* absolute. "Warrantless searches and seizures inside a home are presumptively unreasonable, but because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quotation marks omitted). "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* (quotation marks and alterations omitted). "In order to satisfy the consent exception, the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority." *Id.*

At the outset, the Government concedes that Mr. Green has standing to raise his challenge. (Doc. 24 at p. 4 (citing *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990)). Further, there is no question that Ms. Thomas, the homeowner, had "actual or apparent authority" to grant the Deputies permission to search her home. *Scroggins*, 599 F.3d at 440; *cf. Fernandez v. California*, 134 S. Ct. 1126, 1133 (2014)

(affirming that "consent by [a mere] resident of jointly occupied premises is generally sufficient to justify a warrantless search").

Additionally, based on the testimony received at the hearing, the Court finds that Ms. Thomas granted "effective consent" for the Deputies to search her home in their effort to locate Mr. Green. *Scroggins*, 599 F.3d at 440. "Consent to a search can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent." *United States v. Martinez*, 410 F. App'x 759, 763 (5th Cir. 2011) (citing *United States v. Jaras,* 86 F.3d 383, 390 (5th Cir. 1996)). Here, there is disagreement among the parties whether the Deputies requested and received express permission to search Ms. Thomas's home. However, all sides agree: (1) the Deputies were responding to a complaint about Mr. Green; (2) the Deputies spoke to Ms. Thomas upon their arrival at her house; (3) Ms. Thomas told the officers where Mr. Green was sleeping and pointed in the direction of the guest bedroom; and (4) Ms. Thomas stepped back from the threshold when the Deputies moved to enter the house. Based on this evidence, the Court is satisfied that: (1) even in the *absence* of an express request for consent to search, the Deputies implicitly requested Ms. Thomas's permission to enter her home to locate Mr. Green; and (2) even in the *absence* of an express grant of consent to search, Ms. Thomas's words and gestures implied that the Deputies should enter. *Martinez*, 410 F. App'x at 763.

Finally, the Court is satisfied that Ms. Thomas's consent was "given voluntarily." *Scroggins*, 599 F.3d at 440. "The question whether consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995) (quotation marks and alterations omitted)). The U.S. Fifth Circuit Court of Appeals has enumerated six factors relevant to this "totality of the circumstances" test:

> (1) the voluntariness of the [grantor's] custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the [grantor's] cooperation with the police; (4) the [grantor's] awareness of his right to refuse to consent; (5) the [grantor's] education and intelligence; and (6) the [grantor's] belief that no incriminating evidence will be found.

*Id.* "[A]lthough all of the above factors are highly relevant, no one of the six factors is dispositive or controlling of the voluntariness issue." *Id.* (quotation marks omitted).

Here, three factors weigh strongly in favor of a finding of voluntariness. First, Ms. Thomas was not in custody when she allowed the Deputies into her home. Second, there is absolutely no indication in the record that the Deputies employed coercive tactics to gain access to Ms. Thomas's home. Indeed, Ms. Green's testimony to the grand jury indicates just the opposite—specifically, that the Deputies were "polite and cooperative." (*See* Doc. 35 at p. 24 (further indicating that Ms. Green did not feel "intimidated" or "coerced in any way")). Third, the evidence indicates that, at minimum, Ms. Green tacitly cooperated with the Deputies: (1) she was aware

9

that the Deputies were responding to a complaint about her grandson (indeed, the complaint was based on information she provided to her daughter, Ms. Green); (2) she informed the Deputies where Mr. Green was located with words and gestures; and (3) she moved out of the way when the Deputies sought to enter the house. *Cf. United States v. Guerrero*, 472 F.3d 784, 789–90 (10th Cir. 2007) ("To satisfy the . . . voluntariness requirement, a [grantor's] consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.").

Additionally, the Court finds that the fifth factor provides at least *some* support for a finding of voluntariness, in light of Ms. Thomas's two prior encounters at her home with Corporal Bowser. These prior encounters suggest that regardless of Ms. Thomas's education, her experience and "intelligence" were sufficient for her to appreciate the consequences of: (1) her daughter's report of Mr. Green's criminal activity; and (2) the Deputies' search of her home. *Jenkins*, 46 F.3d 451.

On the other hand, the fourth factor—"[Ms. Thomas's] awareness of [her] right to refuse to consent"—provides at least some support for a finding of non-voluntariness, based on Deputy Edwards's admission at the hearing that he did *not* inform Ms. Thomas of her right to refuse consent before the Deputies entered. *Id.* Likewise, the sixth factor favors a finding of non-voluntariness because it is

undisputed that Ms. Thomas was aware of the possibility that "incriminating evidence [would] be found" in her home *Id*.

Having weighed the evidence, and based on the totality of the circumstances, the Court is satisfied that Ms. Thomas's consent to search her home was voluntary. The Court bases this finding, in particular, on: (1) the Deputies' demeanor and comportment during their investigation; (2) Ms. Thomas's demonstrable cooperation with the Deputies' investigation; and (3) Ms. Thomas's history of encounters with the EBRSO regarding her grandson. The Court finds that these factors outweigh the evidence of non-voluntariness solicited at the hearing.

In sum, the Court finds that the Government has satisfied the consent exception to the Fourth Amendment's warrant requirement by showing: "(1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority." *Scroggins*, 599 F.3d at 440. And because Mr. Green has either withdrawn, or failed to raise any additional challenges to the evidence recovered as a result of his encounter with Deputies on July 5, 2013, his Motion will be denied.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **MOTION TO SUPPRESS (Doc. 21)** is **DENIED.**

Jury

**IT IS FURTHER ORDERED** that Defendant's trial is set for **July 28, 2014** at 9:00 a.m.

Baton Rouge, Louisiana, this 1ST day of July, 2014.

_____
**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**